UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA

- against -

ZENAIDA CODRINGTON,

Defendant.
--------------------------------------------------X

**MEMORANDUM
AND    O R D E R**

07 MJ 118 (CLP)

On February 16, 2006, the government issued a citation charging defendant Zenaida

Codrington with Theft of Government Property, in violation of 18 U.S.C. § 641 (Citation No.

A2039629). Pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13,[1] the charge was later

modified to attempted petit larceny, a class A misdemeanor under New York Penal Law §§

155.25 and 110.00. Trial on the modified charge was held before the undersigned beginning on

May 16, 2007.[2]

Having considered the testimony and the evidence presented at trial, the Court finds the

defendant Zenaida Codrington guilty of attempted petit larceny under New York Penal Law §§

155.25 and 110.00 for the reasons set forth below.

---

[1]The Assimilative Crimes Act, 18 U.S.C. § 13, authorizes enforcement of certain state
criminal statutes for criminal violations committed on federal enclaves such as the Fort Hamilton
Post Exchange in Brooklyn, New York. See Lewis v. United States, 523 U.S. 155, 158 (1998).

[2]The defendant consented before trial to have five law students from Washington Square
Legal Services, supervised by David Patton, Esq., represent her in this action.

## FACTUAL AND PROCEDURAL BACKGROUND

The government alleges that on February 16, 2006, Zenaida Codrington, who was employed at the Fort Hamilton Post Exchange ("PX"), in Brooklyn, New York, exited the PX with two bottles of perfume without rendering payment for them. (Gvt's Ex.[3] 10; Def.'s Ex.[4] X; see also Patton Decl.[5] ¶¶ 2-3, 5; Codrington Decl.[6] ¶ 1).

On April 23, 2007, two days before trial was scheduled to begin,[7] defendant moved to suppress certain inculpatory statements that she made to Officer Diana Torres, the Loss Prevention ("LP") Manager of the PX, contending that Officer Torres failed to advise defendant of her right to remain silent and her right to have an attorney present during questioning. (Patton Decl. ¶¶ 4-5; Def.'s Mem.[8] at 1, 4-5). In response to the motion, the government argued that although Officer Torres was a government employee whose position required her to investigate suspected thefts at the PX, she was not a "law enforcement official," nor was she an agent of the

---

[3]Citations to "Gvt's Ex." refer to the exhibits presented by the government at trial.

[4]Citations to "Def.'s Ex." refer to the exhibits presented by defendant at trial.

[5]Citations to "Patton Decl." refer to the Declaration of David Patton, Esq., of Washington Square Legal Services, filed April 23, 2006.

[6]Citations to "Codrington Decl." refer to the Declaration of Zenaida Codrington, filed April 23, 2007.

[7]Following the issuance of the original citation, a hearing was scheduled for March 30, 2006 in federal court in Brooklyn. When the defendant failed to appear at the scheduled hearing, the undersigned issued a warrant for her arrest on April 7, 2006. Following the defendant's appearance, counsel filed defendant's motion to suppress and the trial was adjourned to May 16, 2007.

[8]Citations to "Def.'s Mem." refer to defendant's Memorandum of Law in support of the motion to suppress statements, filed April 23, 2007.

military police. Thus, she was not required nor authorized to advise defendant of her rights before questioning. (Gvt's Mem.[9] at 5-10).

In addition to seeking to suppress defendant's statements, defendant also raised an objection to the admissibility of a copy of a surveillance video intended to be introduced by the government as evidence at trial. (Def.'s Letter[10] at 1-2). Defendant had no objection to the introduction of certain digital still photographs taken of the perfume bottles, but asserted that the copy of the surveillance video offered by the government was barred by the Best Evidence Rule and the Rule of Completeness. See Fed. R. Evid. 106, 1003, 1004. (Def.'s Letter at 1-2).

## SUPPRESSION HEARING

On May 16, 2007, this Court held a suppression hearing to determine whether defendant's statement to Officer Torres was obtained in violation of the Fifth Amendment privilege against self-incrimination and whether the videotape evidence intended to be introduced by the government was barred by the Best Evidence Rule and the Rule of Completeness. Based on the testimony presented during the suppression hearing and the legal analysis set forth below, the Court grants defendant's motion to suppress the statements made to Officer Torres, but finds the copy of the videotape to be admissible.

---

[9]Citations to "Gvt's Mem." refer to the government's Memorandum of Law in opposition to defendant's motion to suppress statements, filed May 7, 2007.

[10]Citations to "Def.'s Letter" refer to defendant's letter filed May 10, 2007 in response to the government's May 1, 2007 request for a pre-trial hearing regarding the admissibility of photographic and video evidence. Citations to "Gvt's Letter" refer to the government's letter submitted May 1, 2007 requesting a pre-trial hearing regarding the admissibility of video and picture evidence.

A. Suppression Hearing Testimony

At the suppression hearing, the government presented the testimony of Diana Torres, who stopped Ms. Codrington as she exited the PX on February 16, 2006. (Tr.[11] at 7). According to Ms. Torres, she was employed at the Army and Air Force Exchange Service ("AAFES") on February 16, 2006 in the position of Loss Prevention Manager, responsible for detecting shoplifting, dealing with employee theft cases, and conducting safety inspections. (Id.) Ms. Torres, who wears civilian clothes and carries no badge or weapon, testified that she received no training or instructions from the military police and did not consider herself to be a law enforcement officer. (Id. at 8-9). Instead, she was trained in accordance with AAFES policy, which dictated that Loss Prevention staff may not physically touch or restrain anyone or conduct physical searches of anyone, even if instructed to do so by military police. (Id. at 9).

Ms. Torres explained that when a non-employee was suspected of shoplifting, AAFES policy required her to identify herself, ask the suspected individual to accompany her back to the Security Office, and call the military police. (Id.) With respect to employees suspected of theft, her job was to conduct an investigation and an interview of the employee prior to contacting the military police. (Id. at 10). Although Loss Prevention staff are not permitted to touch the employees or search their belongings, Loss Prevention staff members are authorized to conduct "parcel checks," in which they ask an employee to remove items from his or her belongings. (Id.) AAFES policy requires that parcel checks be conducted randomly at least once a week, and employees are informed at the time of hire that they may be subjected to parcel checks while

_____

[11]Citations to "5/16 Tr." refer to the transcript of proceedings held before this Court on May 16, 2007.

employed at the PX. (Id. at 10-11).

If an item is discovered during a random parcel check, the Loss Prevention staff member asks the employee for a receipt and if one is not produced, the employee would be asked to go to the Security Office for further questioning. (Id.) Ms. Torres testified that during this time, the employee is "free to leave. We can't hold them." (Id. at 10-11). If they leave, the only thing the Loss Prevention staff can do is call the military police; the staff member may not physically stop the employee. (Id. at 11). Once the interview is completed, the military police are called either way. (Id.)

Ms. Torres testified that on February 16, 2006, prior to conducting a parcel check of Ms. Codrington, she conducted random parcel checks of "quite a few" people as they were exiting the PX. (Id. at 12). When Ms. Torres greeted defendant outside the employee entrance at approximately 7:30 p.m. on February 16, 2006, she asked Ms. Codrington to open her bag. When she complied with the request, Ms. Torres discovered two perfume bottles in Ms. Codrington's belongings. (Id. at 12, 16). Ms. Torres then asked Ms. Codrington if she had a receipt for the perfume. (Id.) When Ms. Codrington could not produce a receipt, Ms. Torres asked her to come back to the Security Office. (Id.) Ms. Torres denied that she touched or physically searched Ms. Codrington's bags and she further denied that there were any law enforcement officers present when she interviewed Ms. Torres. (Id. at 12-13). Although Ms. Torres did not recall Ms. Codrington asking to leave so that she could pick up her grandchildren (id. at 13, 18), she did testify that if defendant had made that request, she would have asked if there was anyone else who could pick up the grandchildren. (Id.) She conceded that she never actively told Ms. Codrington that she was free to leave. (Id. at 18). However, if Ms. Codrington

5

had insisted on leaving, Ms. Torres states that she would not have stopped her from doing so. (Id. at 13). The military police would, however, have been called. (Id.)

Ms. Torres testified that after she took a statement from Ms. Codrington, she typed up a summary of the statement and then asked Ms. Codrington to sign it. (Id. at 15). She waited until after she had taken the statement to call the military police. (Id. at 16).

The military police subsequently arrived, placed Ms. Codrington under arrest, and transported her to the military police station. After her arrest, Ms. Codrington was advised of her Miranda rights and made a separate statement to the military police. Ms. Torres testified that once the military police were called, she played no further role in questioning defendant, nor did she advise Ms. Codrington of her rights. (Id.) Although she was not required to fill out any paperwork for the military police, Ms. Torres testified that she gave them the statement that she had taken from Ms. Codrington and memorialized in writing. (Id. at 14). She testified that it is normal procedure to provide copies of such statements to the military police. (Id. at 15).

The government also called Shelton Irick, Vice President of Loss Prevention for AAFES, who works in the AAFES headquarters located in Dallas, Texas. (Id. at 25).[12] Prior to working for AAFES, Mr. Irick was employed as Loss Prevention manager for Montgomery Ward. (Id.) He testified that he currently is in charge of supervising the Loss Prevention operations for AAFES world-wide. (Id.) Among his responsibilities are the training of Loss Prevention staff at the various AAFES locations. (Id.) He emphasized, however, that the military police do not participate in the training of the Loss Prevention staff members, nor do they direct the actions of

---

[12]With the consent of both parties, Mr. Irick was permitted to testify by telephone. (Id. at 26).

6

AAFES employees in any way. (Id. at 27).

Mr. Irick confirmed Ms. Torres' testimony that when there is an employee involved with a suspected loss of store inventory or property, the Loss Prevention staff gather together what evidence there is, such as refunds or register voids, video evidence and witness statements, and then they interview the suspect. (Id.) Once "we're sure that there is a loss that resulted from dishonesty, then we'll call a supporting law enforcement agency, and we report it and turn everything over to them." (Id.) If there is no evidence of a crime, the military police are not called. (Id. at 28). The purpose of the investigation is to determine whether there really is a loss and who caused it; if there is an employee involved, the purpose is to "find out how it happened, the methodology used, so we can prevent re-occurrences or at least minimize our exposure." (Id. at 27-28). In addition, the information is transmitted to the Store Manager or General Manager so that appropriate action may be taken with respect to the employee. (Id. at 28). Mr. Irick confirmed Ms. Torres' testimony that non-employees suspected of theft are not interviewed, except to the extent that they may be witnesses. (Id.)

Mr. Irick testified that he was aware of various court decisions that required Article 31(b) rights[13] to be given to members of the military, but he testified that, in response, the Vice President of AAFES Loss Prevention instituted a policy that the Loss Prevention staff would not interview any military members,[14] including those who work as part-time employees with AAFES. (Id. at 29). He testified that when interviewing an employee, the Loss Prevention

_____

[13]Article 31(b) provides for the equivalent of <u>Miranda</u> warnings under the Uniform Code of Military Justice. 10 U.S.C. § 831(b). (<u>See</u> discussion <u>infra</u> at 14).

[14]It should be noted that there was no evidence suggesting that Ms. Codrington was a member of the armed forces.

7

associates are "not law-enforcement;" they are just employees, "simply gathering the facts – gathering up the information and the facts, so we can take management action." (Id. at 30).[15] He further explained that even if ordered to do so by military police, AAFES employees would not give Miranda warnings because they are not law enforcement personnel. (Id. at 33).

On cross-examination, Mr. Irick conceded that he is a federal employee, employed by the Department of Defense. (Id. at 35). He also conceded that the head of AAFES is Major General Paul Essex and the director of Loss Prevention is Colonel Jorge Garza. (Id.) He testified that AAFES profits are paid directly to the various branches of the military but that the employees' salaries are market-based. (Id. at 36). He conceded that there was a concern about the use of statements taken during interviews being admissible in court. (Id. at 39). He also conceded that he was aware of the statement in the Exchange operating policies manual which contains a reference to the use of fictitious evidence and notes that "admissions gained through the use of fictitious evidence are admissible in court." (Id. (quoting Def.'s Ex. U, Section 4-3)). He also conceded that the Loss Prevention Manual "encouraged" personnel "to use a room not located in a CID/OSI or other law-enforcement agency's office" so as not to cause the employee to believe the interview was custodial. (Id. at 46).

In moving to suppress defendant's statement to Ms. Torres, defendant argues that she should have been advised of her Miranda rights prior to the interview. Defendant argues that because she was subjected to custodial interrogation as contemplated in Miranda without having

---

[15]Mr. Irick compared his responsibilities to those of a Loss Prevention staff member in a civilian store such as Montgomery Ward, and he testified that there was no difference in either duties or policies, in that crimes that occurred in the store had to be reported to the police and employees suspected of criminal activities were investigated in the "very same" manner. (Id. at 32-33).

been given warnings, the statements she made to Officer Torres may not be used against her at trial. (See Def.'s Mem. at 4).

## B. Standards for Custodial Interrogation

It is well-established that before a law enforcement officer may question a suspect in custody, the defendant must first be advised of her rights under Miranda and there must be a knowing and voluntary waiver of those rights. Miranda v. Arizona, 384 U.S. 436, 475 (1966). See also Mathis v. United States, 391 U.S. 1, 3-4 (1968) (holding that "[o]ne in custody who is interrogated by officers about matters that might tend to incriminate him is entitled to be warned [of his Miranda rights]"). Although "[t]he protections afforded by Miranda must be strictly enforced," the Second Circuit has made it clear that they "should only be enforced in situations which implicate the concerns that motivated that decision." United States v. Morales, 834 F.2d 35, 37 (2d Cir. 1987) (citing Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). The government bears a "heavy burden of proof" to show that defendant understood the rights and knowingly waived those rights. Tague v. Louisiana, 444 U.S. 469, 470-71 (1980) (per curiam); North Carolina v. Butler, 441 U.S. 369, 373 (1979) (holding that the prosecution bears a "great" burden to prove a valid waiver).

The Second Circuit has defined "custodial interrogation" as existing "when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, . . . (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures

9

sought . . . (the investigative intent requirement)." <u>United States v. Morales</u>, 834 F.2d at 38

(internal citations omitted). In determining whether a defendant has been subjected to custodial

interrogation, the court must first determine whether the defendant was subject to either "a

'formal arrest or restraint on freedom of movement' of the degree associated with a formal

arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quoting <u>Oregon v. Mathiason</u>, 429

U.S. 492, 495 (1977)). "Interrogation" has been defined to include not only express questioning

but also "its functional equivalent," including "any words or actions on the part of the police . . .

that the police should know are reasonably likely to elicit an incriminating response." <u>Rhode

Island v. Innis</u>, 446 U.S. 291, 301 (1980). Factors considered by the courts are the location and

atmosphere of the interrogation, <u>Oregon v. Mathiason</u>, 429 U.S. at 494-95; the length of the

interrogation, <u>see</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437-38 (1984); and the tone and language

used by the police during the questioning. <u>See</u> <u>United States v. Guarno</u>, 819 F.2d 28, 31-32 (2d

Cir. 1987).


1) <u>Law Enforcement Officer</u>

Before determining whether Ms. Codrington was "in custody" and whether Ms. Torres

had the requisite investigative intent, the Court must determine whether Ms. Torres is a "law

enforcement officer." <u>See</u> <u>United States v. Morales</u>, 834 F.2d at 38. This is because it is clear

that "[t]he activities of a purely private person in obtaining evidence – whether testimonial or

physical – are not subject to the constitutional limitations on obtaining evidence which include

the requirement that <u>Miranda</u> warnings be given before custodial interrogation . . . ." <u>United

States v. Abney</u>, No. 03 Cr. 60, 2003 WL 2204782, at *3 (S.D.N.Y. Aug. 29, 2003) (citing

Burdeau v. McDowell, 256 U.S. 465, 475-76 (1921); United States v. Romero, 897 F.2d 48, 52 (2d Cir. 1990) (holding that "Miranda does not apply to incriminating statements made to private persons in the absence of police subterfuge or intimidation"), aff'd, 109 Fed. Appx. 472 (2d Cir. 2004)). The Second Circuit has held that private citizens or security personnel employed by a private citizen are not required to give constitutional warnings even when they take a suspect into custody. See United States v. Antonelli, 434 F.2d 335, 337 (2d Cir. 1970). Under these principles, one court has held that an off-duty police officer, acting in the course of his employment as a security guard for a private store, was not required to provide Miranda warnings when questioning an individual suspected of passing counterfeit currency. See United States v. Abney, 2003 WL 2204782, at *5-6.

The government argues that "Miranda warnings are only required when a suspect is subjected to interrogation by law enforcement personnel or their agents." (Gvt's Mem. at 5 (citing Illinois v. Perkins, 496 U.S. 292, 297 (1990); United States v. Romero, 897 F.2d 47, 52 (2d Cir. 1990))). Thus, the government argues that most courts look to the questioner's relationship to law enforcement to determine if Miranda warnings must be given. (See Gvt's Mem. at 50-51). According to the government, the key inquiry is not whether a questioner is a federal employee, but rather whether he or she is an "agent of law-enforcement . . . working under the control of the police." (See 5/16 Tr. at 50). The government contends that Ms. Torres was not an agent of the military police and that the main purpose of her questioning was to secure store property and gather information in order to determine if defendant should have been terminated. (See id. at 51). In further support of this line of argument, the government highlights the fact that here, Ms. Codrington was dressed in civilian clothing, carried neither a badge nor a

11

weapon, had neither actual nor apparent authority to forcibly detain a suspected shoplifter, and was simply engaged in interviewing a co-worker. (See Gvt's Mem. at 7; 5/16 Tr. at 52). In addition, the government notes that because AAFES personnel are not law enforcement agents, and because their practice and procedures indicate that they may not and normally do not physically detain or otherwise place suspects under formal arrest, they are more akin to private security guards, which courts have found are not subject to Miranda requirements. (See id. at 51-52; Gvt's Mem. at 6). Indeed, the government cites United States v. Abney in support of its argument that Loss Prevention personnel, such as Diana Torres, are not law enforcement agents or instrumentalities of the government. (See Gvt's Mem. at 6-8 (citing United States v. Abney, 2003 WL 22047842, at *1)).

Defendant argues that a close examination of Abney reveals that it applies to "[t]he activities of a *purely private person*" in obtaining evidence and does not address the issue here – namely, whether Ms. Torres, as a federal government employee,[16] is subject to Miranda requirements. Defendant contends that federal employees need not be law enforcement officers for Miranda to apply. (See Def.'s Reply[17] at 2 (citing Mathis v. United States, 391 U.S. at 3-4

[16]For the purposes of this pre-trial suppression motion, the Court has assumed that AAFES Loss Prevention personnel are employees of the federal government. (See infra at 8, 11). Mr. Irick testified that he is a federal employee, employed by the Department of Defense, and that AAFES is overseen by the Post Commander, a United States Major General. Morever, although not binding on this Court, the Court of Military Appeals has found that AAFES "was under the control of military authorities." United States v. Quillen, 27 M.J. 312, 314 (1988). Since the government does not take issue with the general proposition that Ms. Torres was employed by the federal government, the Court focuses its inquiry instead on whether she can be considered a "law enforcement official."

[17]The government argues that Mathis is based on the Fifth Amendment's Due Process Clause and not on the privilege against self-incrimination. (See 5/16 Tr. at 52). Further review of that case, however, reveals that the government's argument is unavailing. See Mathis v.

(requiring Miranda warnings in a civil case prior to questioning by IRS agents because such "routine tax investigations . . . frequently lead to criminal prosecutions"))). However, Mathis did not involve non-law enforcement federal employees. Rather, it involved questioning by an IRS agent conducting a civil tax investigation of a defendant who was incarcerated, and the Supreme Court explicitly applied Miranda, quoting that "'when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.'" Mathis v. United States, 391 U.S. at 4 (quoting Miranda v. Arizona, 384 U.S. at 478) (emphasis added). While the IRS agent was not conducting a criminal investigation, he was a state actor whose actions triggered the protection of the Fifth Amendment because tax investigations frequently become criminal matters. See id. Therefore, it is not clear from Mathis that Ms. Torres was subject to Miranda requirements on the basis of the fact that she was a federal government employee.

In advancing her argument that Ms. Torres, as a federal government employee, was subject to Miranda requirements, defendant relies on a series of decisions from the Court of Appeals for the Armed Forces, which has repeatedly held that AAFES security guards are government employees performing an investigatory function for purposes of providing warnings as required by Article 31 of the Uniform Code of Military Justice. (See Def.'s Reply[18] at 6 (citing United States v. Ruiz, 54 M.J. 138 (C.A.A.F. 2000); United States v. Baker, 30 M.J. 262

---

United States, 391 U.S. at 3-4. In Mathis, the United States Supreme Court held that, regardless of why a suspect is in custody, the privilege against self-incrimination is jeopardized when one is subjected to custodial interrogation about matters that might tend to incriminate oneself, and is therefore entitled to be given one's Miranda warnings. See id. at 3-5.

[18]Citations to "Def.'s Reply" refer to Defendant's Reply to Government's Response to Defendant's Motion to Suppress, filed May 14, 2007.

(C.M.A. 1990); United States v. Quillen, 27 M.J. 312 (C.M.A. 1988))). Article 31 provides in relevant part as follows:

> No person subject to this chapter [10 U.S.C. §§ 801 et seq.] may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

In United States v. Quillen, the Court of Military Appeals held that a base-exchange detective was required to advise a service member of his rights under Article 31 prior to questioning. See 27 M.J. at 314. The court rejected the military judge's finding that the store detective was unrelated to direct law enforcement activities and therefore was not acting in an official capacity. Id. at 314. Even though the detective was a civilian and not subject to the Uniform Code of Military Justice, the court held that when the person being questioned about a suspected crime was a "servicemember," Article 31 requirements are imposed on a civilian investigator "(1)[w]hen the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity,' . . . and (2) when the civilian investigator acts 'in furtherance of any military investigation, or in any sense as an instrument of the military.'" Id. (internal citations omitted). The court specifically rejected the notion that, because they are in civilian clothes or derive their salary from store sales, AAFES Loss Prevention personnel are not government employees performing an investigatory function. Id. at 314. Thus, for purposes of advising an individual of his or her rights under Article 31, the court concluded that the detective was "in a very real and substantial sense . . . an instrument of the

14

military" required to give warnings to a serviceman prior to questioning. (Id.)[19]

The government argues, however, that Article 31 provides a broader privilege against self-incrimination than the Fifth Amendment because military personnel are trained to obey their superiors, and thus, these decisions of the military courts are irrelevant to the question here. (See 5/16 Tr. at 51; United States v. Quillen, 27 M.J. at 315-16 (Cox, J., dissenting)). Although defendant concedes that these decisions are not binding on this Court, she contends that they provide the only guidance on this narrow issue, because no other court has engaged in a thorough analysis of the question of whether AAFES employees are required to give Miranda warnings prior to questioning someone. (See 5/16 Tr. at 48-49). In the instant case, however, the shoplifting suspect, Ms. Codrington, was not a member of the armed services, but rather another civilian employee of AAFES. (See Gvt's Mem. at 2-3). Therefore, Article 31 is not applicable and the reasoning behind the strict exclusionary rule created by Article 31 – that the chain of command should give rise to stronger Miranda-like protections – does not apply here. See United States v. Quillen, 27 M.J. at 315-16 (Cox, J., dissenting).[20]

---

[19]Despite the sections of the Exchange Service Manual explaining that AAFES is not a law enforcement agency, the court found that AAFES' practices appeared to be akin to those of a law enforcement entity. See id. at 313-14, 315. Specifically, the court noted that the detective stopped the suspect and displayed her badge, requested the suspect's identification card, escorted him to the manager's office with store employees, and questioned him in a manner that the court found amounted to custodial interrogation. See id. The court concluded that warnings were required before the suspect's responses could be used as evidence at his court-martial. See id. at 313. Most notably, the court in Quillen did not focus on the policy behind the greater privilege under Article 31 or the fact that the suspect was a member of the military, instead deciding the case based on the nature of the custodial interrogation. See id. at 314-15.

[20]Moreover, the Court in Quillen explicitly declined to consider whether an exchange detective is an investigative or law enforcement officer for purposes of 28 U.S.C. § 2680(h). Id. n.2. Subsection h of 28 U.S.C. § 2680, which provides for exemptions to the Federal Tort Claims Act, provides in pertinent part that:

That does not, however, end the Court's inquiry because the question remains whether AAFES Loss Prevention personnel are closer to Loss Prevention personnel at civilian retail stores than they are to federal law enforcement agents. (See Gvt's Mem. at 6). See also United States v. Abney, 2003 WL 22047842, at *5 (stating that the issue in that case was whether under all of the facts and circumstances, the interrogator was acting as a police officer or a private security guard, and whether he was acting as an instrument or agent of the government). The government contends that AAFES is a "non-appropriated, joint military, for-profit organization with oversight by the Department of the Defense . . . [which] is structured like any other U.S. corporation." (Id. (citing http://www.aafes.com/pa/factsheet-9.pdf[21])). To the extent that the government's argument attempts to distinguish AAFES Loss Prevention personnel from the rest of the military, the very website it cites belies that proposition. The "Doing Business with AAFES" page of the AAFES website (http://www.aafes.com/pa/selling/default.asp) describes AAFES as a "military organization," and four of the five AAFES leaders pictured on the home page are members of the military. (See http://www.aafes.com).

------------------------------------------------

> "[f]or the purposes of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

However, as discussed infra at 17-18, Fifth Amendment protections may be implicated regardless of whether the questioner is a law enforcement officer, and it is questionable whether this definition of "law enforcement officer" is relevant to a criminal trial in light of the fact that the Federal Tort Claims Act carves out certain exceptions to sovereign immunity to provide for civil damages for torts committed by federal employees.

[21]The AAFES "Fact Sheet" web page cited by the government is no longer operational, but as of the issuance of this opinion, the updated "Fact Sheet" web page is available at http://www.aafes.com/pa/factsheet-11.pdf.

Moreover, the court in Quillen expressly noted that the Supreme Court "long ago recognized 'that post exchanges . . . are arms of the government [and] . . . integral parts of the War Department' . . . the control of [which] lies with the post commander and applicable service regulations." United States v. Quillen, 27 M.J. at 314. The Quillen court reasoned that because "the organization which employed [the exchange detective] and directed her actions . . . was not private, but governmental in nature," her questioning was done at the behest of military authorities and "in furtherance of their duty to investigate crime at base exchanges." Id.

Moreover, even though AAFES Loss Prevention personnel share certain characteristics with private security personnel, Abney made clear that "'[w]hether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances.'" 2003 WL 22047842, at *5 (citing Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 614 (1989)).

In this case, Officer Torres, a federal employee, was effectively an instrument of the military and an agent of law enforcement, who was acting in furtherance of a military investigation. See Mathis v. United States, 391 U.S. at 3-4; United States v. Abney, 2003 WL 22047842, at *5; United States v. Quillen, 27 M.J. at 314. While Torres was, like other store employees, compensated on a pay scale based on store sales, she was nonetheless a federal worker whose employer was "an integral part[] of the War Department" under the control of the military. See United States v. Quillen, 27 M.J. at 314. Furthermore, "it is not the particular job title that determines whether the government employee's questioning" requires Miranda warnings, "but whether the prosecution of the defendant being questioned is among the purposes,

17

definite or contingent, for which the information is elicited." United States v. D.F., 63 F.3d 671, 682-83 (7th Cir. 1995), rev'd on other grounds, 517 U.S. 1231 (1996) (reasoning that the Fifth Amendment protection against self-incrimination was not restricted to the actions of law enforcement personnel, the Seventh Circuit affirmed the district court's suppression of defendant's unwarned confession made to non-law enforcement personnel in a county mental health facility to which defendant was voluntarily committed, because the mental health workers saw the prosecution of defendant as a part of their work); United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987) (using the same analysis but finding that the district court was not clearly erroneous in allowing introduction of statements made by the defendant while in custody at a federal correctional facility because the physician's assistant who elicited the responses during a routine physical had "no investigative purpose"). See also Mathis v. United States, 391 U.S. at 3.

Indeed, the circuits are in agreement that the mere fact that a questioner is a government employee, standing alone, does not implicate the Fifth Amendment's privilege against self-incrimination, but non-law enforcement actors may nonetheless be subject to the constraints of the Fifth Amendment – implicating Miranda – where their questioning is of a "nature that reasonably contemplates the possibility of criminal prosecution." United States v. D.F., 63 F.3d at 683 (noting that "a government employee need not be a law enforcement official for his questioning to implicate the strictures of the Fifth Amendment") (citing Estelle v. Smith, 451 U.S. 454, 462 (1981) (holding that the Fifth Amendment's privilege against self-incrimination "does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites"); see Mathis v. United States, 691 U.S. at 3-4.

Therefore, a non-law enforcement actor working on behalf of the government may be subject to the Miranda requirements where he creates a sufficiently coercive environment. Illinois v. Perkins, 496 U.S. 292, 295 (1990); United States v. Rodriguez, 356 F.3d 254, 260 (2d Cir. 2004) (holding that no Miranda warning was necessary where the INS agent who questioned the defendant was not aware of the potentially incriminating nature of the disclosures he sought from defendant) (citing United States v. Morales, 834 F.2d at 38 (noting the existence of an "investigative intent requirement" (when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought) in addition to Miranda's "in custody requirement")); Alexander v. Connecticut, 917 F.2d 747, 748 (2d Cir. 1990) (reversing on remand the circuit's earlier finding that petitioner's Miranda rights were violated, in light of Illinois v. Perkins, because the confessing inmate was not aware that he was being interrogated by a government informant).

However, the Second Circuit in Morales also observed that "[t]he questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner." 834 F.2d at 38. This inquiry focuses on the perceptions of the suspect rather than the intent of the police. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In a custodial setting, interrogation therefore exists of "either express questioning or its functional equivalent." United States v. Moody, 649 F.2d 124, 127-28 (1981). Such direct questioning or its equivalent "reflect[s] a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. at 300. In this case, Ms. Torres directly questioned defendant about the events that gave rise to defendants' arrest, and as was her intent, provided the military police with the typed statement.

2) Investigative Intent

In this case, it is clear that prosecution of defendant was one of the purposes for which the

information was elicited. Testimony at the pre-trial suppression hearing indicated that

prosecution of suspected shoplifters is among the purposes of AAFES policy and practice. (See

5/16 Tr. at 27, 39, 42-43, 46). Indeed, Ms. Torres conceded that she operated under a manual

that, through its explicit concerns about what kinds of evidence and statements would be

admissible in court, demonstrates that prosecution of suspected shoplifters is among the purposes

of AAFES policy and practice, and specifically requires cooperation with law enforcement. (See

id.). In compliance with PX policy, Torres cooperated fully and immediately with the military

police investigation. (See 5/16 Tr. at 15-16, 27, 42-43).

Similarly, Mr. Irick, who oversaw the drafting of the Loss Prevention Manual ("EOP 16-

1") which contains a section on interviewing suspected employee shoplifters, testified that the

primary purpose of interviews was to "establish we have a loss and who caused it, but, if it is an

employee, we need to find out how it happened, the methodology used, so we can prevent re-

occurrences or at least minimize our exposure." (5/16 Tr. at 27-28). He also acknowledged that

AAFES policy explicitly requires cooperation with law enforcement. (Id. at 42-43). He testified

that once Loss Prevention personnel have gathered information sufficient to conclude "that there

is a loss that resulted from dishonesty, then, we'll call a supporting law-enforcement agency, and

we report it and turn everything over to them." (Id. at 27; see also Def.'s Ex. U ¶ 9-4 (instructing

Loss Prevention personnel to "[r]efer all people confirmed as having removed merchandise from

the facility without payment to the local law enforcement authority for action").

Moreover, Mr. Irick acknowledged that the policies contained in the Loss Prevention

Manual reflect a concern about the fact that statements and evidence seized during the course of investigation would be admissible in court. (5/16 Tr. at 39).[22] Section 9-26(j) of the Manual, which concerns the return of stolen merchandise after recovery from a suspected shoplifter, reads: "[t]he chain will include as few people as possible since the chain may have to be reconstructed by the appearance in court of each person who handled the merchandise." (See 5/16 Tr. at 42; Def.'s Ex. U ¶ 9-26(j); see also, id. ¶ 11-21 (stating that "[a]n unbroken chain of custody must be established to admit video tapes into evidence at a trial or hearing")).

Thus, it appears that Ms. Torres operated with the "investigative intent" required by the Second Circuit in Morales. See United States v. Morales, 834 F.2d at 38. Even if there is a question as to whether Loss Prevention personnel are in fact "law enforcement" or not, the Court finds that as a federal employee, Ms. Torres operated with the necessary "investigative intent" in conducting the questioning of Ms. Codrington and that she did so with the ultimate goal of providing whatever information she could gather as to criminal activity to the military police.

2) "In Custody" Requirement

Thus, the only question remaining is whether Ms. Codrington was "in custody" at the time the statement was taken.

In arguing that Ms. Codrington was not "in custody" for purposes of Miranda, the government notes that two circuit court cases have held that when store security guards interview

---

[22]Section 4-3 of the Manual reads: "Offensive language should be avoided and, although admissions gained through the use of fictitious evidence are admissible in court, this practice should be undertaken only after careful consideration and then with extreme caution." (Id.; see also Def.'s Ex. U ¶ 4-3).

civilian employees, they are not considered in custody for purposes of <u>Miranda</u>, as distinguished

from military personnel subject to the Uniform Code of Military Justice. (<u>See</u> Gvt's Mem. at 7,

11 (citing <u>United States v. Tai</u>, 38 Fed. Appx. 162 (4th Cir. 2002); <u>United States v. Nickson</u>, No.

98 Cr. 339, 2002 U.S. LEXIS 15049, *1 (E.D. Cal. May 29, 2002) (unpublished decision), <u>aff'd</u>

<u>in part</u>, 41 Fed. Appx. 128 (9th Cir. 2002))). However, neither of these cases resolves the issue

before the Court. The court in <u>Tai</u> declined to decide whether the defendant was in custody, 38

Fed. Appx. at 165, and the court in <u>Nickson</u>, although finding under facts similar to the instant

case that the defendant was not in custody, did not reach the constitutional issue of whether

AAFES employees are required to give <u>Miranda</u> warnings. <u>See United States v. Nickson</u>, 2002

U.S. LEXIS 15049, at *2.

Paragraph 4-6 of the Manual suggests that Loss Prevention personnel perform interviews

of suspects in a room not located in a law enforcement agency's office because "[t]he police

atmosphere and surroundings may cause an associate to believe the interview is custodial, rather

than administrative, and may lend support to a claim that an associate's legal rights were

violated." (<u>See</u> 5/16 Tr. at 46; Def.'s Ex. ¶ 4-6). Arguably, this provision demonstrates not only

an awareness on the part of AAFES that, because Loss Prevention personnel are federal

employees performing an investigatory function, they are subject to <u>Miranda</u> limits, but also a

wish to avoid these requirements.

Indeed, despite the fact that she wore civilian clothes, Officer Torres' conduct in stopping

and escorting defendant to a small, closed office and detaining her there for 30 minutes for

questioning and asking her to sign a statement, closely mirrored the actions of the questioning

officer in <u>Quillen</u>, which the military court found amounted to custodial interrogation. <u>See</u>

22

United States v. Quillen, 27 M.J. at 315; Def.'s Mem. at 2-3; Gvt's Mem. at 3-4. Under the circumstances, particularly given Ms. Codrington's claim that she asked to leave to pick up her grandchildren and was told she could not, (see Def.'s Mem. at 3), the Court finds that defendant was subject to custodial interrogation because a reasonable person in these circumstances would not have felt free to leave and "would have understood [her]self to be subjected to the restraints comparable to those associated with a formal arrest." See United States v. Newton, 369 F.3d 659, 670, 671-72 (2d Cir. 2004) (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995), for the proposition that the "free-to-leave inquiry" is an essential component of a custody determination, but that "the ultimate inquiry" is the "arrest/arrest-like restraint test" established by California v. Beheler, 463 U.S. 1121, 1125 (1983)). Therefore, the Court finds that Officer Torres was required to give defendant Miranda warnings before subjecting her to custodial interrogation and, in the absence of such advice, the resulting statements must be suppressed.

For the foregoing reasons, the Court grants defendant's motion to suppress the statement.


C. Surveillance Video

In addition to moving to suppress defendant's statement, defendant also seeks to preclude the government from offering into evidence a copy of the surveillance video taken on February 16, 2006, arguing that because portions of the video were lost and never reviewed by defendant, admission of the government's selected footage would violate the Best Evidence Rule and the Rule of Completeness. (See Def.'s May 10 Letter[23] (citing Fed. R. Evid. 106, 1003, 1004)). The

---

[23]Citations to "Def.'s May 10 Letter" refer to defendant's letter response to the government's letter of May 1, 2007 requesting a pre-trial hearing on the issue of the admissibility of printed black and white copies of digital still photographs taken of the perfume bottles found

government conceded that certain footage was missing from the beginning and end of their copy of the surveillance video, but argued that the missing footage was not relevant and did not prejudice the defense in any way. (See Gvt's May 1 Letter at 2).

At the suppression hearing, the government called Carlos Sosa, who was employed as a PX detective on February 16, 2007. (5/16 Tr. at 55). Mr. Sosa testified that on the morning of the incident, he was "doing a walk through" of the store when he observed defendant near the jewelry counter with two boxes of perfume. (Id. at 82). Since defendant's job entails filling orders for military clothing and generally would not involve the handling of perfume, Mr. Sosa decided to continue to observe defendant's movement through the store using the store's surveillance system. (Id. at 78, 84-85, 88-89). By the time he began recording on the PX store surveillance cameras, defendant had left the jewelry counter and had proceeded toward the customer service area where she works. (Id. at 84-85). Although Mr. Sosa testified that he could not be positive from watching the video that she had two perfume bottles in her hand, he had seen the bottles when he was on the floor of the PX and it appeared on the monitor that she still had something in her hands. (Id. at 80-81). The video shows defendant placing the items behind some articles of clothing that were on the counter in the customer service department area. (Id. at 87-88). Even though there are two cameras that cover this area, the angles of the cameras were such that they did not focus on that portion of the counter where defendant placed the items. (Id. at 88). The video then shows defendant gathering certain items of military clothing "in a bunch" and carrying them back into the manager's office, which is where defendant kept her personal

---

on defendant's person on February 16, 2006 and a copy of portions of surveillance video taken on that day ("Gvt's May 1 Letter").

belongings. (Id. at 90). Thereafter, according to Mr. Sosa, defendant continued about her job for the rest of the day but nothing related to the perfume bottles appeared on the remainder of the surveillance footage. (Id. at 91).

Mr. Sosa testified that there are two monitors that capture any camera angle in the store and that record all day; there are also four other monitors that record twenty-four hours a day, seven days a week, on a multiplex. (Id. at 55, 93). As Mr. Sosa was watching the surveillance cameras on that day, he switched back and forth from the monitors as he would do in the case of a suspected employee theft. (Id. at 94). Following defendant's arrest, Mr. Sosa testified that he maintained the original copy of the videotaped footage in his office. (Id. at 62). He further testified that "[s]everal times," he made copies of the videotape on VHS and DVD for the government and the defense. (Id. at 57-58).[24] The two tapes that resulted were a combination of simultaneous recordings, possibly from two separate camera angles. (Id. at 57).

Mr. Sosa testified that during the course of making multiple copies of the footage, a portion of the original footage "came to be lost" through "human error." (Id. at 58-59). Specifically, the government identified approximately 10 to 15 seconds that were missing from the beginning of the consolidated tape, which allegedly showed defendant walking through the PX holding two bottles of perfume. (Id. at 75). In addition, there were several hours of footage at the end of the original tapes, which were not copied because none of that footage showed defendant with the perfume bottles. (Id.) Although Mr. Sosa testified that he did not really know when or how the original footage came to be lost (see id. at 59-60, 64), the government asserts that the missing footage was probably lost during the conversion of the two originals into the

---

[24]He explained that the footage was being recorded on VHS tapes. (Id. at 57).

single combined tape. (See id.). Mr. Sosa did testify that having reviewed the original tapes during the copying process, he confirmed that there was between 10 and 15 seconds in the beginning of the tape that was missing. (Id. at 74-75).

Defendant moves to preclude admission of the consolidated tape based on the Best Evidence Rule and the Rule of Completeness. Rule 1002 of the Federal Rules of Evidence sets forth the Best Evidence Rule, which states that "the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." See Fed. R. Evid. 1002. Rule 1003 permits the admission of a copy or "[a] duplicate . . . to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) under the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed. R. Evid. 1003.

In this case, however, the evidence that the government seeks to introduce is neither the original nor a duplicate original of the actual videotapes. Rule 1004 of the Federal Rules of Evidence provides certain exceptions authorizing the admission of copies when (1) the original has been lost or destroyed, except when destroyed in bad faith; (2) the original is unobtainable by available judicial process or procedure; (3) the original is in the possession of the party's adversary, who is on notice but fails to produce the original; or (4) the evidence relates to a collateral matter. See Fed. R. Evid. 1004.

In this case, the original tape has been lost and there is no evidence that it was destroyed in bad faith. The Court credits Mr. Sosa's testimony that, in the process of being copied numerous times, the original was lost though "human error" and not intentionally destroyed. Defendant argues that the bad faith of the government need not be shown, because if any portion

of the recording is unavailable, regardless of the reason, the entire recording is inadmissible. (See Def.'s May 10 Letter at 3 (citing United States v. Henriquez, 731 F.2d 131, 138 (2d Cir. 1984) (stating "deliberate, negligent or other destruction of tapes, whether for budgetary reasons or otherwise, will not be tolerated by this court"); United States v. Yevakpor, 419 F. Supp. 2d at 247 (stating that "if selected segments of a video or audio exhibit will be offered at trial, the entire video or audio exhibit had best be preserved, so that opposing counsel . . . may review the evidence and determine if 'any other part or any other writing or recorded statement . . . ought in fairness . . . be considered contemporaneously with' the proffered segments") (citing Fed. R. Evid. 106))). See also United States v. Grammatikos, 633 F.2d 1013, 1018 (2d Cir. 1980) (noting that "[t]he government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation").

However, unlike in Henriquez, where the government agency at issue had a standing policy to destroy tape recordings after thirty days, or Yevakpor, where the destruction of evidence was routine and "was not an inadvertent erasure," 419 F. Supp. 2d at 247, in this case the loss of the initial ten to fifteen second segment appears to have been inadvertent. While the court in Henriquez stated that it was concerned primarily with negligent or deliberate destruction of evidence, the court nonetheless denied the defendant's motion to preclude the use of evidence at trial because other evidence "militated against exclusions or sanctions in that case." United States v. Yevakpor, 419 F. Supp. 2d at 247-48 (citing United States v. Henriquez, 731 F.2d at 137-38). Indeed, while the Henriquez court required the United States Attorney to advise government agencies to avoid deliberate or negligent destruction of tapes, it did not go so far as

27

to state the rule defendant asks the Court to follow - - exclusion of a tape if any portion is unavailable for any reason. "[R]ather, the appropriateness and extent of sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss." United States v. Grammatikos, 633 F.2d at 1019-20. See also United States v. Henriquez, 731 F.2d at 138 (allowing tape recordings where "[t]he trial judge found no intent to destroy evidence and 'absolutely no prejudice to the defendants' since the [evidence] 'clearly support[ed] the oral testimony given"); United States v. Grammatikos, 633 F.2d at 1020 ("'[w]here, as here, destruction is deliberate, sanctions will normally follow, . . . unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to defendant'") (quoting United States v. Bufalino, 576 F.2d 446, 449 (2d Cir.), cert. denied, 439 U.S. 928 (1978)); United States v. Yevakpor, 419 F. Supp. 2d at 250, 252 (holding that "[e]xclusion is an appropriate sanction given the government agency's deliberate destruction of evidence" where "the proffered evidence, as it currently exists, and given the Government's self-selection of material, is more prejudicial than probative").

Rule 106, also known as the Rule of Completeness, states that when one party introduces a recording into evidence, "an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." See Fed. R. Evid. 106. However, Rule 106 does not require that simply because a portion of a recording is admitted into evidence, the entire recording must also be admitted. See Pereira v. Superintendent, Wyo. Corr. Facility, No. 04 CV 3445, 2005 U.S. Dist. LEXIS 41990, at *13 (E.D.N.Y. Aug. 19, 2005). The Supreme Court has interpreted Rule 106 to mean that when excluded portions of documentary evidence are necessary to avert

"misunderstanding or distortion," those portions are ipso facto admissible under Rules 401 and 402. See Beech Aircraft Corp. v. Rainey, 488 U.S. 173 (1988) (citing 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 106, p. 106-20 (1986)). However, at least one court within the Second Circuit has held that when such excluded portions are unavailable, the remaining evidence may be inadmissible. See United States v. Yevakpor, 419 F. Supp. 2d 242, 249-50, 252 (N.D.N.Y. 2006) (finding that "[t]he government cannot make use of video segments that have been cherry-picked when the remainder of the recording has been erased or recorded-over subsequent to a defendant's arrest").[25]

Defendant argues that under the circumstances, it would be unfair to admit the duplicate copy of the surveillance tape in this case because crucial footage at the beginning of the tape is missing. (See Def.'s May 10 Letter at 2). Defendant asserts that the missing fifteen seconds at the beginning of the surveillance tape would be "exculpatory in nature" and that it would therefore be unfair to require defendant to prove the contents of a recording she has never seen, warranting exclusion of the entire tape. "The government has never provided to defendant any video footage of Ms. Codrington removing the perfume bottles in question from the perfume case; indeed, [the government] submit(s) that there has never been such footage." (Id.) Defendant further notes that the remaining copy of the surveillance video neither shows defendant in the perfume department nor the direction she was moving before the start of the

---

[25]The Second Circuit has also interpreted Rule 106 to justify the admission of previously excluded portions of partially received documents or statements only under certain circumstances, none of which applies here, although the same concerns are relevant: "to explain the admitted portion, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it." United States v. Rivera, 61 F.3d 131, 135-36 (2d Cir. 1995) (internal citations omitted).

currently available footage. (See id.). Given that the Court finds that the destruction of tape in this case was inadvertent, defendant's argument thus hinges on her assertion that such footage of defendant is "crucial evidence" for the prosecution's case, and therefore prejudicial to defendant's case. (See id.).

However, this Court finds that the missing portion of the tape is irrelevant to the question of whether defendant walked out of the PX with merchandise for which she had not paid. These actions form the basis upon which defendant has been charged with attempted petit larceny. Based on the testimony of Mr. Sosa, the missing footage at the beginning of the tape did not show defendant taking the merchandise from the shelf because at the time he first observed her, she already had the perfume in hand. At best, the missing footage may have showed defendant carrying the merchandise through the PX, which is already evident on the portion of the tape currently before the Court. Moreover, the missing hours at the end of the tape are equally irrelevant because, as seen on the video, Ms. Codrington had already taken the perfume into the back room, beyond the sight of any surveillance cameras. The Court further credits the testimony of Mr. Sosa that, based on his review of the video, from that point forward the perfume bottles were not seen on the video.

In this case, the Court finds that the destruction of the missing fifteen seconds of tape was inadvertent, see, e.g., United States v. Yevakpor, 419 F. Supp. 2d at 250, 252, and that defendant has suffered no prejudice because the weight of the evidence supports the conclusion that the missing portion would not exculpate defendant. See United States v. Henriquez, 731 F.2d at 138. Rule 106 does not require that simply because a portion of a recording is admitted into evidence, the entire recording must be admitted, see Pereira v. Superintendent, Wyo. Corr.

Facility, 2005 U.S. Dist. LEXIS 41990, at *13, and in this case, the missing portion is not needed "to explain the admitted portion, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it." See United States v. Rivera, 61 F.3d at 135-36.

Accordingly, the Court denies defendant's motion to suppress the surveillance video.


## FACTUAL BACKGROUND

Following the suppression hearing, the Court held the trial beginning on May 16, 2007. During the trial, the government called as witnesses Detective Sosa, Loss Prevention Manager Diana Torres, Officer Nicholas Abugel, and Fort Hamilton PX custodian of inventory records David Farrell. In addition, defendant called student attorney Rishi Zutshi, who had conducted a survey and taken pictures of the PX inventory.

Based on the testimony presented at trial, the Court finds the following facts:

Carlos Sosa, an exchange detective for the PX for nine and one-half years, had, at the time of trial, investigated approximately 300 to 400 instances of shoplifting. (5/16 Tr. at 54, 139-40). In Mr. Sosa's experience, employee theft is a problem at the PX and perfume is one of the most commonly stolen items. (Id. at 140).

On the day of the incident, Mr. Sosa first observed Ms. Codrington by the jewelry counter holding two boxes of perfume. (Id. at 143).[26] Since her job function did not normally entail handling bottles of perfume (id. at 146), Mr. Sosa began to monitor Ms. Codrington's actions,

---

[26]Mr. Sosa clarified that he never actually observed defendant remove the boxes of perfume bottles from the shelf. (Id. at 191-92).

31

testifying that "[he] would normally watch any employee that carried anything like that, picked up anything like that." (Id. at 146-47). He returned to the security room in the back of the PX, where he began monitoring defendant on closed circuit television ("CCTV"), first observing her by the automotive section, walking towards her workstation in the back of the PX. (Id. at 143-44).

Mr. Sosa observed defendant place the two boxes of perfume behind some clothing on a file cabinet approximately five to ten feet from the cash registers on the Customer Service counter. (Id. at 144-46). She then proceeded to process what appeared to be three orders for military clothing, per her usual routine. (Id. at 144). After placing the clothing in bags, she scooped up the two bottles of perfume under the third order of clothing without putting them in the bag and walked directly to the back office. (Id. at 145). Although Mr. Sosa or someone else from the Loss Prevention staff continued to surveil defendant for the next six to seven hours (id. at 147-48), defendant was never observed paying for the bottles of perfume, nor was anyone else seen removing the bottles of perfume from the counter where they had been placed by defendant. (Id. at 148-49).

Although it is common for employees to shop at the PX (id. at 168), if an employee wanted to return or exchange an item previously purchased, he or she was directed to notify either Mr. Sosa or store security that they were going to seek a refund or exchange an item, so that there would be no confusion as to what the employee was doing. (Id. at 150). On the day in question, defendant did not notify any management employee that she was going to bring a product into the store for a refund or exchange. (Id. at 151). Therefore, upon observing defendant removing the two boxes of perfume from the counter, Mr. Sosa decided to conduct a

parcel check on defendant. (Id. at 150).

He contacted Officer Torres, who had worked at the PX for approximately sixteen years as Loss Prevention manager, and had investigated "about one hundred" shoplifting cases. (Id. at 195, 205). On February 16, 2007, after receiving a telephone call from Mr. Sosa regarding the activities of defendant (id. at 197), Officer Torres began monitoring defendant on the store video surveillance system. (Id. at 197-99). At the end of her shift, Ms. Codrington was observed retrieving her bags from the military clothing office and walking through the store to the employee exit, where Loss Prevention Manager Torres performed a parcel check. (Id. at 151). During the course of conducting the parcel check, Officer Torres found defendant in possession of two apparently new perfume products carried by the PX. (Id. at 200). She also had no receipt for the purchases. (Id.) In addition, despite the fact that all new employees are informed of PX policy requiring them to notify management before they bring any merchandise back into the facility (id. at 202-03), defendant did not notify management that she was bringing the perfume back into the PX. (Id.)[27] Upon finding the merchandise in defendant's possession at the parcel check, Officer Torres asked defendant to return to the store with her to be interviewed, and defendant complied. (Id. at 200). Following the interview, Ms. Torres typed up the questions and answers and defendant initialed after each. (Id. at 201).

The perfume boxes Mr. Sosa had observed defendant carrying through the store were

_____

[27]At the time of her testimony, Officer Torres had been attending the New York City Police Department's Police Academy since January 10, 2007. (Id. at 195). However, Officer Torres admitted that she did not know what the defendant brought to work with her that day. (Id. at 205). She also did not recall whether the two boxes of perfume she found on the defendant had price stickers or magnetic security strips on them. (Id. at 214-15). Nor did Officer Torres conduct a search of defendant's work area to look for removed wrapping, stickers, or magnetic strips. (Id. at 218).

returned eventually to him. (Id. at 152-53). At trial, he identified photographs of the perfume boxes taken from Ms. Codrington that day. (Id. at 155). Mr. Sosa conceded that while some perfume boxes at the PX had magnetic strips on them designed to activate the alarm system, no alarm went off on February 16, 2006. (Id. at 176-77). However, he also testified that the magnetic strips could be removed. (Id. at 192; see also id. at 216). Mr. Sosa testified that he recalled examining the merchandise on that day and noted that one of the boxes was wrapped in plastic, while the other was not. (Id. at 179-80). He also noted that the perfumes were "most likely" eventually returned to the sales floor to be resold. (Id. at 180). Mr. Sosa never conducted a search of the PX to find the presumably removed plastic wrap and possibly removed magnetic strip. (Id. at 193).

After the parcel check, Mr. Sosa reported to Officer Nicholas Abugel of the Fort Hamilton military police ("MP") that defendant had exited the PX with two boxes of perfume for which she had not paid. (Id. at 173-74). Nicholas Abugel, formerly of the New York City police department, is employed as a police officer by the Army's civilian police force located in Fort Hamilton, Brooklyn and was on duty on February 16, 2006. (5/17 Tr.[28] at 7-8). On February 16, 2006, Mr. Sosa called him to the PX a short time before 9:00 p.m. to perform a shoplifting investigation. (Id. at 15-16). He assisted Ms. Codrington in filling out a sworn statement about the events of that evening. (Id. at 9; see Gvt's Ex. 6).[29]

---

[28]Citations to "5/17 Tr." refer to the transcript of proceedings held before the Court on May 17, 2007.

[29]Officer Abugel admitted that he inferred that defendant had removed the perfume bottles from the case and that Mr. Sosa never actually told him such a thing, despite his earlier testimony to the contrary. (5/17 Tr. at 29-30).

The top portion of defendant's sworn statement was personally written out by the defendant; the rest consisted of questions prepared by Officer Abugel and defendant's answers, written out by Officer Abugel and initialed by defendant. (5/17 Tr. at 9; see Gvt's Ex. 6). In essence, defendant stated that she had previously purchased both bottles of perfume at the PX on approximately December 5, 2005. (5/17 Tr. at 12; see Gvt's Ex. 6). She further claimed that on the day of the incident, she brought the two bottles of perfume and a gift for the manager into the store with her, and then left the store with the bottles of perfume. (5/17 Tr. at 11; see Gvt's Ex. 6).

Defendant stated that she had placed the bottles of perfume "behind some clothes" because she was helping a customer. (5/17 Tr. at 11-12; see Gvt's Ex. 6). She admitted that she did not have her receipts for the purchase and could not remember where the receipts were. (5/17 Tr. at 12; see Gvt's Ex. 6). She knew she was being stopped for shoplifting and would not have been in that predicament had she shown someone the perfume on the way in. (5/17 Tr. at 10-11; Gvt's Ex. 6).

Officer Abugel identified the black and white still photographs of two bottles of perfume, Elizabeth Arden's Red Door "Revealed" ("Arden") and Celine Dion's "Always Belong" ("Dion"), as accurate photographic representations of the two perfume bottles taken from Ms. Codrington. (5/17 Tr. at 13, 26; see Gvt's Exs. 3, 4). He also identified an "evidence/property custody document," or property voucher, that listed the two bottles of perfume, their sizes, and their ten-digit UPC codes. (5/17 Tr. at 22, 31; see Def.'s Ex. Y). However, Officer Abugel admitted that he did not note the condition of the bottles or whether there were price tags or magnetic strips on them, despite his understanding that the presence or absence of those facts

would be important in the later prosecution to show whether the bottles were PX property. (5/17 Tr. at 24, 26-27; see Def.'s Ex. Y).

David Farrell, an end-user computer technician for the AAFES at the Fort Hamilton PX and the West Point PX, testified that in February 2006, he was employed as a retail point-of-sale computer operator. (5/17 Tr. at 32). His duties included maintaining and monitoring store inventory and merchandise pricing on a computer program called ASAP, or "A Store Automation Program," which stored all information on ordering, receiving, transfers, purchases, and sales. (Id. at 33). In the regular course of business, Mr. Farrell created sales history reports and item performance history reports from the ASAP program. (Id. at 33-36; see Gvt's Exs. 7, 8).

With respect to the bottle of Arden perfume taken from defendant, two of the reports indicated that the Arden perfume was first "received"[30] by the PX on October 23, 2003 and last received in February of 2004. The reports further indicated that no sales of Arden were recorded on December 5, 2005, when defendant claimed to have purchased the perfume she was found with, nor were there any sales of Arden recorded during the rest of that week or the entire month of November. (Id.) The first sale of Arden occurred during the week ending December 24, 2005, which means that the earliest date at which the perfume could have been sold is December 18, 2005. (Id. at 37-38). Moreover, no sales of Arden were made in January or February of the following year.

With respect to the Dion perfume, Mr. Farrell testified that the first time it was received

---

[30]According to Mr. Farrell,"received" means that the order was filled and merchandise arrived at the store to be scanned item-by-item and put into the ASAP system. (Id. at 36-37). Although each perfume box was individually scanned, their UPC codes are identical, so there is no way to tell which particular bottle has been sold out of a batch of bottles. (Id. at 37).

into inventory was January 17, 2006, more than one month after the date defendant estimated she had purchased that item. (Id. at 40). The first bottle of Dion was not sold until the week ending February 4, 2006. (Id.)[31] The inventory records further showed there was no single day between November 2005 and the date of defendant's arrest when a bottle of Arden and a bottle of Dion were sold together in the same transaction. (Id. at 45-46).[32]

Turning to the sales records and item performance history of the Dion perfume for the period between November 5, 2006 and April 10, 2007, Mr. Farrell testified that the record shows that two bottles were sold in the sixth week of 2006, which should have left an inventory of two, but an item inquiry revealed that only one bottle remained on the shelf on April 10, 2007. (Id. at 47-49; see Gvt's Ex. 8). As for the Arden perfume, Mr. Farrell testified that the item performance history showed that one bottle was sold in the 31st week of 2006, leaving an inventory of one bottle, but despite the fact that the sales record showed that no bottles were sold after that time, the item inquiry taken on April 10, 2007 revealed that there were no bottles left on the shelf. (5/17 Tr. at 49-51; see Gvt's Ex. 7). Only by going to the shelf and counting manually could one determine how many bottles were actually on hand. (5/17 Tr. at 53).

Defendant called as a witness Rishi Zutshi, a student attorney with Washington Square

---

[31]Mr. Farrell went on to testify that even if a bottle of perfume had not been entered into the ASAP system, it could be brought up to a cash register and sold, and it would still be recorded at that time as a sale with the inventory report recording that item as a negative. (Id. at 42-43). The item performance history the government introduced, therefore, showed every sale of Dion from the first time it was sold until April 10, 2007. (Id. at 45).

[32]However, Mr. Farrell conceded on cross-examination that if the two bottles were entered manually, they could have been purchased at the same time without it showing up in the records. (Id. at 56). Nonetheless, Mr. Farrell testified, when a product is brought to the cashier, they are supposed to scan it, not enter it manually. (Id. at 58).

Legal Services, representing defendant in this matter. (Id. at 63). Based on four different visits to the PX and an examination of 40 to 50 bottles of perfume, Zutshi testified that, to his recollection, all of the bottles of perfume had AAFES price tags on them and two-thirds to three-fourths of them had magnetic security strips on them. (Id. at 64-66; see Defs'. Exs. B, C, D).[33]

## DISCUSSION

In order to prove that defendant is guilty of Theft of Government Property, in violation of 18 U.S.C. § 641,[34] the government must prove beyond a reasonable doubt that defendant attempted to steal the property of the PX. See N.Y. Penal Law § 155.25 (McKinney 2007) (providing that: "[a] person is guilty of petit larceny when he steals property"); N.Y. Penal Law § 110.00 (McKinney 2007) (providing that: "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime").

In this case, the evidence shows that defendant left the PX on February 16, 2006 with two bottles of perfume. In her own statement to Officer Abugel, defendant admitted that the perfume had originated at the PX. (See Gvt's Ex. 6). Although the surveillance cameras did not capture defendant removing the bottles from the shelves, Mr. Sosa observed defendant in the perfume

---

[33]Zutshi took photographs of sample perfume bottles during a visit on April 18, 2007. In a picture of three shelves of a perfume case containing "more than 20" perfume bottles, only two magnetic tags were visible on the fronts of the boxes. (Id. at 69-71; see Def.'s Ex. Q; Gvt's Ex. 20).

[34]As noted supra at p. 1 n.1, this charge has been modified to attempted petit larceny under New York Penal Law 155.25 and 110.00, a class A misdemeanor, pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13.

area with two boxes in her hand. Since defendant was charged with removing the bottles from the store without rendering payment, the fact that she was not actually observed removing them from the shelf is irrelevant. The issue is whether defendant ever paid for the bottles of perfume. Based on the evidence before it, the Court finds that defendant never purchased the perfumes.

Turning first to the Dion perfume, defendant did not have a receipt for the bottle and the documentary evidence is clear that defendant did not purchase that bottle of perfume at or near the time she claimed to have bought it on December 5, 2005. (See id.). Indeed, the product was not even received in stock at the PX until January 17, 2006, more than a month after the date on which defendant claimed to have purchased it. (See 5/17 Tr. at 40).

As for the Arden perfume, defendant claimed to have bought it at the same time as the Dion perfume on December 5, 2005 (see Gvt's Ex. 6), and again she had no receipt for it. The sales records show that the earliest date on which defendant could have purchased the Arden perfume was December 18, 2005, approximately two weeks later than the date she claimed to have purchased the perfume. (See 5/17 Tr. at 37-38). Furthermore, in light of the fact that defendant claimed to have purchased both bottles of perfume together (see Gvt's Ex. 6), and it was impossible for her to have purchased the Dion perfume at any time before February 16, 2006, the Court concludes that defendant's statement to Officer Abugel as to when she purchased the two perfumes was not truthful.

Finally, an item inquiry, or manual count, of the perfumes indicated a one bottle deficit for each as compared to the sales history report presented at trial. (See 5/17 Tr. at 47-51; Gvt's Exs. 7, 8). The deficit in bottle count is consistent with the conclusion that one bottle of each perfume was removed from the shelves and never scanned at the checkout counter.

Not only was defendant's statement as to the date of purchase contradicted by the documentary evidence, the Court credits Mr. Sosa's testimony that he observed defendant carrying the perfume through the store and concealing it among piles of clothing at her station. The Court's own review of the videotape confirms Mr. Sosa's testimony regarding defendant's actions after she is observed carrying the items to her work area. Furthermore, if she had actually purchased the perfume on an earlier occasion and had intended to return or exchange it, she would not have brought it in to work, carried it through the PX, concealed it, and then left the PX without returning or exchanging it.

Indeed, defendant behaved in a manner inconsistent with that of a person actually planning to return or exchange items. She walked around the store with the items, hid them behind a stack of clothes five to ten feet from the returns counter, and then surreptitiously scooped them up with other items to take them to the back of the store. She then left with the perfume in her possession without having returned or exchanged the bottles, the purpose for which she had ostensibly brought them into the store in the first place. Defendant's conduct does not demonstrate a true intent to return the perfumes and is instead consistent with an intent to steal them.

Defendant argued in summation that it would not make sense for her to behave as she did with 64 cameras trained on almost every part of the PX. However, the Court finds that defendant's behavior is consistent with that of someone attempting to steal items while under the watchful gaze of surveillance cameras. Defendant kept the perfume bottles "in the open" until the moment at which she concealed them under a pile of clothes, only to later remove them to an area which was not under surveillance. Unfortunately for defendant, Officer Sosa's suspicions

40

were raised when he noticed her carrying a product she did not normally handle through an area

of the store in which she did not work. (See 5/16 Tr. at 143-46).

Accordingly, in light of the credible evidence presented at trial, the Court concludes that

defendant never purchased the perfumes, and that she attempted to leave the PX without paying

for them. Therefore, the Court finds defendant guilty of attempted petit larceny under New York

Penal Law § 155.25 and § 110.00. Sentencing is set for June 3, 2008 at 2:00 p.m.

The Clerk is directed to enter judgment against defendant and to send copies of this

Memorandum and Order to the parties either electronically through the Electronic Case Filing

(ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
May 1, 2008

Cheryl L. Pollak
U.S. Magistrate Judge
Eastern District of New York